Scott, J. In England the ancient common law rendered a marriage absolutely void when either of the parties had not the legal capacity to contract marriage, or when there was in fact no legal consent by one of the parties, the same having been obtained by force or fraud, and never afterwards voluntarily acquisced in; and in such cases the courts of chancery and the courts of common' law always exercised the power to declare the marriage absolutely void, whenever the question came before them in a collateral proceeding. (Betsworth vs. Betsworth, Styles R. 10. Ruggles vs. Wogan, Cro. Eliz. 858.) But these courts yielded to the ecclesiastical courts the exclusive jurisdiction to declare the nullity of such marriages by a direct proceeding between the parties, not for want of power in the chancery courts to grant similar relief to the parties as to those marriages void by the common law, but more upon the ground of convenience. But beyond this the jurisdiction over divorces and alimony (which is not necessarily an integral part of a decree for a divorce even when granted a mensa et thoro, and had no place in the English divorce a vinculo matrimonii) belonged exclusively to the ecclesiastical courts, and was never exercised in England by any other courts except only during the usurpation of Cromwell while the spiritual courts were closed, (1 Mad. Ch. 305, citing 2 Showers, 283. 1 Fon., b. 1, ch. 2, sec. 6, note a), which jurisdiction the chancery courts renounced upon the restoration and resumption of authority by the ecclesiastical courts. And upon the same ground of necessity and convenience the chancery courts of Virginia, previous to the act of the legislature of that State of 1826, which conferred upon them a more extensive jurisdiction over these subjects than had ever been exercised in England by the ecclesiastical courts, had already assumed and exercised jurisdiction of alimony in the case of Percel vs. Percel, 4 H. & M. Rep. 507, and other cases to the same extent as the ecclesiastical courts had exercised it — it seeming to have been the unanimous opinion of the five judges of the Virginia court of appeals, who refused to allow an appeal in the case of Percel vs. Percel, that it would be a solecism in the jurisprudence of any enlightened nation to admit the existence of a right without a corresponding remedy, likening our system of jurisprudence to the human body, in which, when one artery is cut off, its functions are to be performed by collateral branches according to the bountiful provisions of nature. So, in our body politic, if by any means the ordinary tribunals for 'affording relief be destroyed, some other tribunal must be found to supply its place, which is generally'the courts of equity, it being the boast of those tribunals to give relief where others are incompetent. Upon this general foundation, then, in reference to which our constitutional and statutory provisions as to these subjects are to be interpreted, it is altogether safe to assume that the chancery courts of this State have rightfully, as to divorce and alimony; all the powers of the English ecclesiastical courts as well as additional powers conferred by our statutes. And, as a general doctrine, it may be also safely assumed that this court, when hearing appeals from the chancery side of the circuit courts, bears the same general relation to these courts that the House of Lords in England bore to the equity side of the chancery courts of that kingdom, and when such appeals are heard here, they will be heard as they were there, • only on the same evidence that was produced on the hearing in the court below. And in order to dispose more distinctly of a preliminary question raised by the appellee, we will remark that, although as a rule of practice adopted by this court, soon after its organization, in the case of Pope, Gov., use, &c. vs. Latham et al., 1 Ark. 66, and ever since adhered to,no difference is observed as to the mode of proceedings between cases brought here by appeal and by writs of error, yet this identity relates more particularly to tbe mode of proceeding in. this court and more exclusively confined to cases from tbe law side of the circuit courts, (in the examination of which this court sits more strictly as a court of errors,) and is not in any sense to be understood of cases brought here irom the chancery side of those courts (wherein this court sits more strictly as a court of appeals) so as to make the doctrines of the cases of Lenox vs. Pike (2 Ark. R. 14,) and Fort vs. Hundley (5 Ark. R. 179) have any effect to exclude, from tbe consideration of this court, any of the depositions that have been read on the trial of any such case from the chancery side of these courts merely on the ground that any such depositions had not been, by bill of exceptions or otherwise, brought on the record: those cases having no such application to chancery cases, as seems to be supposed by the counsel for the appellee. And having premised thus much in reference to preliminary and incidental questions, it is now devolved upon us to examine into tbe correctness of tbe decree of tbe court below. And it being manifest, from a mere glance at the testimony, that the decree cannot be sustained on the ground that facts have been proven which show the husband to have been guilty of such “cruel and barbarous treatment” to the wife as to “endanger her life,” it can only be sustained, if at all, upon the other ground that the proof shows such “indignities to her person as rendered her condition intolerable;” and thus it becomes indispensable to ascertain, if we can, the true meaning of the legislature in the fifth cause for divorce contained in our statute. {Digest, ch. 58, sec. 1.) The act provides that “the circuit court of the proper county shall have power to dissolve and set aside such marriage contract, not only from bed and board, but from the bonds of matrimony for the following causes: first, second, &c., fifth, where either party shall be addicted to drunkenness for the space of one year, or shall be guilty of such cruel and barbarous treatment as to endanger the life of the other, or shall offer such indignities to the person of the other as shall render his or her condition intolerable.” Taking the whole of this specification together, as one general ground of divorce, it. not only is fully commensurate to the legal idea of “ scevitia” of the civil law and of “legal cruelty” as defined by the ecclesiastical courts, but it seems inpontestibly to go beyond both, and place the jurisdiction on broader grounds. Legal cruelty, as these courts defined it, was never recognized as having existence under any state of facts short of “reasonable apprehension of danger of life, of limb, or of health,” or, as it was sometimes more generally expressed, “reasonable apprehension of bodily hurt:” and these courts adjudged such a state of things a sufficient cause for a decree of separation upon the ground that in a state of personal danger no duties to others can be perfectly performed, for the reason that, under such circumstances, the duty of self-preservation, which is primary, in commencement, and paramount in obligation, is superior to the duties imposed by the marital connex-ion, and when called into action is inconsistent with those duties, and render their discharge impossible. Occupying this ground, so supported by reason, drawn from the laws of nature, the ecclesiastical courts rarely, if ever, suffered themselves to be drawn from it, seeming always to apprehend that any departure into a more enlarged field of jurisdiction would result disastrously to the morals and well being of society. Accordingly, in the language of Sir William Scott, whose name is so conspicuously connected with this branch of jurisprudence, “it was the duty and was consequently always the inclination of the courts to keep the rule extremely strict,” and hence, “ mere austerity of temper, petulance of manner, rudeness of language, a want of civil attentions even approaching sallies of passion, if they did not threaten bodily harm, were held not to amount to legal cruelty, and that which merely wounded the mental feelings was, in few cases, admitted, when it was not accompanied with bodily injury either actual or menaced.” “ Still less was it legal cruelty when it wounded not the natural feelings, but those acquired feelings arising from rank; these, however, were not excluded when they were presented as matter of aggravation merely — nor were even words of menace, when they were the mere language of passion, and not the expression of settled malignity. For none of these called into action the paramount duty of self-preservation to paralyse and overshadow the marital duties.” But, on the other hand, mere “ words of menace, importing the actual danger of bodily harm, would justify the interposition of the court, as the law ought not to wait until the mischief is actually done.” “ It will not pause till a tragical event has taken place; words of menace, if accompanied with probability of bodily violence, will be sufficient. It may be enough it they are such as inflict indignity and threaten pain.” Then it would be the duty of the court to say that the suffering party is not obliged to continue in co-habitation under such treatment. (Kirkham vs. Kirkham, 1 Hagg. R. 409.) Such being legal cruelty, as expounded and administered in those tribunals as a cause supervenient for which separation a mensa et thoro was decreed, it is manifest, as we have remarked, that that provision of our statute,'which we are considering, confers a broader jurisdiction, whether for weal or woe time and experience alone can prove, and as it is not our office either to vindicate or condemn the policy of any law, but simply to listen to its mandates, we shall endeavor to tread only the path which is marked out by duty: and with this view, when we look at these doctrines of the ecclesiastical courts, as we have shown they were expounded and administered, we find they fell confessedly far short of the great object designed, and left, for the “succour of religion and the consolation of friends,” many cases without the sphere of their action of great individual hardship and severity. To provide a remedy for some of these was doubtless the object of our legislature in making the provision of law which we are now considering. But although this seems clear, it is difficult to determine the true limits of this additional jurisdiction: and feeling the force of the considerations which induced the ecclesiastical courts to hold the rule of “ legal cruelty extremely strict,” we shall preserve the same strictness applicable to this enlargement of that jurisdiction. The description of drunkenness specified is not without its significancy. It is not alone drunkenneess, nor habitual drunkenness, but it must be an habitual drunkenness extending through a period of time not less than one year, and it may be even doubted whether this would be necessarily within the true meaning of the legislature; for it would be difficult to conceive that it was designed to add to the deplorable consequence of intemperance by making it the sole cause for severing the conjugal tie. . A more rational .construction would seem to be that it was designed to operate only when it would thereby render the marital state intolerable, as in most cases it does, though not certainly in every case. And so it may be safely assumed of those personal indignities mentioned by the statute, which necessarily include rudeness, vulgarity, unmerited reproach, haughtiness, contempt, contumely, studied neglect, intentional incivility, injury, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate, alienation and estrangement, both of word and action, that they must be no less habitual, continuous, and permanent, to create that intolerable condition contemplated by the statute, and for which it provides relief. The spiritual courts, we have seen, granted relief only in those cases where they adjudged that it was impossible that the duties of the conjugal life could be discharged, and they regarded abiding reasonable apprehension of bodily harm to create such impossibility; and this condition of abiding reasonable apprehension would seem necessarily to include the intolerable condition contemplated by our statute, which would seem to be such a condition as human nature, under its influence, could not endure through a long period of time, or, at least, could not endure it without extreme suffering, and which the statute contemplates as the fruit, not only of the description of intemperance specified and of such cruehand barbarous treatment as will endanger life, but also of repeated, numerous, and continued personal indignities. Such intolerable condition not going to the extent ■of rendering it impossible to discharge the duties of married life as did legal cruelty in contemplation of law, but merely to the ■extent of rendering it impossible, for reasons which the public wisdom approves, to require or compel the performance of those duties under such continuous extreme and unmerited suffering. True it is that a husband may successfully defend a bill for a divorce on the ground of alleged ill conduct, by showing a just provocation in the ill behavior of the wife: but it does not follow from this that the wife cannot succeed unless she be entirely without blame; for the reason which would justify the imputation of blame to the wife, would not justify the ferocity of the husband. (Holden vs. Holden, 1 Hagg. R. 458.) And while it is likewise true that the wife cannot establish any claim against her husband, founded on her own violation of conjugal duty, (Coper and wife vs. Clason, &c., 3 John. C. C. 521,) she cannot be defeated of alimony by one or two exhibitions of justly aroused passion during a space of four or five years, during all of which period, with these one or two exceptions when she was but true to the instincts of her nature, she submitted in meekness, smiling through her tears, to an almost continued flow of insult and unmerited contumely. So holding the law, we have examined minutely all the testimony in this case, and being altogether satisfied that the facts established bring the complainant’s case within the provision of the statute, as we have herein construed it, and that she was therefore entitled to all the relief sought, the decree of the court below dismissing the cross bill and granting the complainant’s prayer for a divorce from the bonds of matrimony is, in all things, affirmed. And although in so much of the decree as relates to alimony, there is manifest error in its want of conformity to the principles of equity — being incommensurate as to amount with the estate and pecuniary condition of the husband as shown by the testimony, without suitable provision to secure its payment, and in being limited in its duration to the single state of the complainant below, and would have therefore been reformed had she complained; but, as all these errors are in favor of the appellant, the entire decree of the court below must be therefore affirmed.